Ronald M. BYRNES, Appellant,

v.

The MUTUAL LIFE INSURANCE COM-
PANY OF NEW YORK, a Corpo-
ration, Appellee.

No. 13769.

United States Court of Appeals
Ninth Circuit.

Dec. 6, 1954.

Rehearing Denied Jan. 10, 1955.

Kramer, Morrison, Roche & Perry, Phoenix, Ariz., John Alan Appleman, Urbana, Ill., for appellant.

Evans, Hull, Kitchel & Jenckes, Norman S. Hull, John E. Madden, Phoenix, Ariz., Haughton Bell, New York City, for appellee.

Before BONE and POPE, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

On July 1, 1947, the Mutual Life Insurance Company of New York, in response to an application of one Albert Francis Morairty, issued two $50,000.00 life insurance policies on the life of Albert Francis Morairty upon the payment of a premium of $1,484.00 each. Each policy was for one year. In one policy, Morairty's wife, Ruth M. Morairty, was the beneficiary. The other policy which is attached to the complaint filed in this case, states that the beneficiary is the insured's partner, Ronald M. Byrnes.

The policy year was to be reckoned from July 16, 1947. The yearly provision was to be followed by a life paid up policy at the age of 85 years. In the Complaint filed in the District Court of the United States for the District of Arizona, Byrnes sought to recover on the policy. He alleged that Morairty died on the 29th day of January, 1948, that Byrnes as beneficiary had demanded the payment of the sum of $50,000.00, which was refused.

The Answer of the defendants admitted the issuance of the policy, the payments of the premium, notice of proof of death and refusal of payment. It denied that any amount was due.

A second defense alleged that the policy wherein Byrnes was named beneficiary never took effect because of certain misrepresentations made by the deceased to the medical examiner.

In this respect the application which was signed by Morairty contained the following clause:

"All the statements and answers in this application including those made to the Medical Examiner are made to induce the Company to issue the policy and are true. The policy shall not take effect unless and until it is delivered to the insured and the first premium is paid during the insured's good health; except as may be otherwise provided in any conditional receipt issued. No agent or other person except the President, Vice President or a Secretary of the Company has authority to accept any representation or information not contained in this application or to modify or to enlarge, any contract of insurance or waive any requirement in the application or in the contract of insurance."

After setting forth the answers given to specific inquiries about health, medical treatment, hospitalization, the defendant alleged that the answers were false in that

" * * * he had had X-rays, blood tests and other special laboratory tests and his health was then impaired, and he had had illnesses other than hay fever, and had suf-

fered from bowel hemorrhages, stomach trouble, duodenal ulcer, anemia, and other illnesses, since childhood, both before and after the six-year period then last past, and he had not been free from gas or other gastro-intestinal symptoms, or from dietary restrictions, and he had, within the period of five years then last past consulted other practitioners, and for illnesses other than infected wisdom tooth and an acute cold, and he had been in a hospital for observation, treatment and other medical purposes, both before and after the six-year period then last past, and for illnesses other than acute cold, being such illnesses as have been mentioned hereinbefore."

The Answer then alleged that the answers given by the insured were of such nature that the information called for was presumably within the personal knowledge of applicant and he knew the answers to be false; that the insurer relied on the representations, did not know they were false, but believed them to be true and would not have issued the policy had they known them to be false. They did not discover their falsity until after the death of Morairty. Thereafter, on April 5, 1948, they rescinded the life insurance policy and tendered to plaintiff at Phoenix, Arizona, the sum of $1,552-.09, for the amount paid for the premium with interest to date of tender. Plaintiff refused to accept the tender which has been kept open.

As a third defense it was alleged that the policy never took effect as a contract because Morairty was not in good health when the same was delivered to him and it was especially agreed in the contract that the policy would not take effect until it was delivered to the insured and the first premium paid during his good health.

On September 17, 1950, the appellee moved for summary judgment. Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. In conjunction with the motion, the depositions of Doctors Thomas W. Woodman, Robert S. Flynn and F. T. Fahlen were filed by the appellee and answers to requests for admissions as to the existence of certain documents. The Court, on December 5, 1952, granted summary judgment and on December 29, 1952, formal judgment that appellant take nothing by the action was entered.

This is an appeal from the judgment.

The only question presented is whether upon the facts presented by the pleadings and affidavits, there remained a "genuine issue as to any material fact". Rule 56(c), Federal Rules of Civil Procedure.

In the background of the case is the decision of this court in Mutual Life Insurance Company of New York v. Morairty, 9 Cir., 1949, 178 F.2d 470. That case had been instituted by the widow on the policy made payable to her. On a trial before a jury, a verdict was rendered in her favor in the United States District Court of Arizona and a judgment entered upon the verdict. On appeal this court sustained the position of the insurance company that because of the misrepresentations which accompanied Morairty's application, the court should have directed a verdict in their favor. And having failed to do so, it should have granted a motion for judgment notwithstanding the verdict. The judgment was reversed with direction to the lower court to enter a judgment for the insurance company upon payment to the widow of the amount of the premium paid on the policy, plus interest thereon.

In view of the discussion to follow, it it well to give the summary of Judge Bone's opinion as to the misrepresentation:

"Therefore, even assuming the hemorrhages were caused solely by the diverticuli (and this is giving appellee the benefit of doubtful evidence for if they were caused by some other illness or infirmity there could be no conceivable excuse for failing to reveal the hemorrhages and treatment) we are convinced

that despite Morairty's disclosure of the existence of the diverticuli, (1) his failure to disclose the serious hemorrhages which he may have believed were caused by diverticulitis, (2) coupled with his affirmative declaration that he had been free from gastro-intestinal symptoms for the past six years, and (3) his non-disclosure of the hospitalization and treatment by Dr. Flynn in 1944, constituted a concealment or misrepresentation of material facts which were presumably within the knowledge of the insured, and, under the Arizona authorities discussed above, this amounted to legal fraud sufficient to invalidate the policy." Mutual Life Ins. Co. v. Morairty, supra, 178 F.2d at page 475.[1]

We are to determine whether, in view of this finding by the Court of Appeals, based on the uncontradicted testimony in the record which was also made a part of this record, the trial court was correct in determining that there was no genuine issue of fact to be tried and in granting summary judgment against Byrnes.

## I

### The Nature of Summary Judgment

■ The object of the procedure for summary judgment is not *to determine* an issue, but whether *there is an issue* to be tried. Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 1951, 191 F.2d 881, 883.

Against the summary disposition of an issue stands the fundamental right to trial in open court by adversary proceedings, and through testimony adduced therein on the issues tendered. The late Judge Cardozo has stated in simple, yet classic language, the condition which justifies a departure, under summary judgment, from this principle:

"To justify a departure from that course and the award of summary relief, the court must be convinced that the issue is not genuine, but

feigned, and that there is in truth nothing to be tried." Curry v. Mackenzie, 1925, 239 N.Y. 267, 270, 146 N.E. 375, 376.

And the Supreme Court of the United States, in interpreting this rule, has stated that it

"* * * authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, 64 S.Ct. 724, 728, 88 L.Ed. 967.

■ In determining the matter, resort is had to extrinsic facts through affidavits, admissions and the like in order to find out if there is a real issue. This implies that such a finding will be made despite the fact that the pleadings as they stand present such issue. Fletcher v. Krise, 1941, 73 App.D.C. 266, 120 F.2d 809, 812; Miller v. Miller, 1941, 74 App.D.C. 216, 122 F.2d 209, 212; Koepke v. Fontecchio, 9 Cir., 1949, 177 F.2d, 125, 127; Dewey v. Clark, 1950, 86 U.S. App.D.C. 137, 180 F.2d 766, 770–772.

■■ This and other Courts of Appeals have had occasion to apply the principle readily. They have generally held that if the pleadings and affidavits show that there is no issue as to any fact material to the determination of the question, summary judgment should be granted. Gifford v. Travelers Protective Ass'n, 9 Cir., 1946, 153 F.2d 209, 211; Leishman v. Radio Condenser Co., 9 Cir., 1948, 167 F.2d 890, 892; Suckow Borax Mines Consolidated, Inc., v. Borax Consolidated, Inc., 9 Cir., 1950, 185 F.2d 196; Engl v. Aetna Life Ins. Co., 2 Cir., 1943, 139 F.2d 469; Fisher v. Underwriters at Lloyd's, London, 1942, 7 Cir., 131 F.2d 1016; Beidler & Bookmyer, Inc., v. Universal Ins. Co., 2 Cir., 1943, 134 F.2d 828;

---

1. In the foregoing we have numbered the misrepresentations for ready reference in the discussion to follow.

Compania De Remorque y Salvamento v. Esperance, 2 Cir., 1951, 187 F.2d 114; Columbia Hospital for Women and Lying-In Asylum v. United States Fidelity & Guaranty Co., 1951, 88 U.S.App.D.C. 251, 188 F.2d 654. The burden to show clearly that there is no genuine issue is on him who makes the motion. Wittlin v. Giacalone, 1946, 81 U.S.App.D.C. 20, 154 F.2d 20, 21–22; Fairbanks, Morse & Co. v. Consolidated Fisheries Co., 3 Cir., 1951, 190 F.2d 817, 824; F. A. R. Liquidating Corp. v. Brownell, 3 Cir., 1954, 209 F.2d 375, 379–380.

■ In the last analysis, there is no general pattern that can be applied. In each case we must determine whether there is a triable issue of fact. One of the general tests applied is this: If the testimony presented by the affidavits is such that a directed verdict would have to be granted, the court is justified in granting summary judgment unless affirmative testimony is offered to discredit the testimony. The Court of Appeals for the Second Circuit has stated the principle in this manner:

"When a party presents evidence on which, taken by itself, it would be entitled to a directed verdict if believed, and which the opposite party does not discredit as dishonest, it rests upon that party at least to specify some opposing evidence which it can adduce and which will change the result. In this case the defendant should have specified some instances that it had reason at least to suspect would contradict Markert; the record against it was too specific to be met by mere hypothesis. Had the case gone to trial, it could not have asked the judge to tell the jury that, though Markert had testified honestly, they must reduce the recovery because he might have been mistaken about some of the actors. We cannot therefore see how a trial would add any certainty to the conclusion which is inevitable upon this record." Radio City Music Hall Corporation v. United States, 2 Cir., 1943, 135 F.2d 715, 718.

This test has been adopted and applied by this court in Gifford v. Travelers Protective Ass'n, 9 Cir., 1946, 153 F.2d 209, 211. And see, Hurd v. Sheffield Steel Corp., 8 Cir., 1950, 181 F.2d 269, 271. This court, in the widow's case, has held that the three acts of concealment were fatal to recovery,—(1) the hemorrhage, (2) non-disclosure of hospitalization in 1944, and (3) the affirmative statement by Morairty that he had been free from gastro-intestinal symptoms for the last six years. The law of materiality of Arizona was stated by Judge Bone in this manner:

"The test of materiality is whether the facts, if truly stated, might have influenced a reasonable insurer in deciding whether to accept or reject the risk; the insurer need not show that it would have rejected the applicant had it known of the falsity of the claim." Mutual Life Ins. Co. of New York v. Morairty, supra, 178 F.2d at page 474.

■ In First National Ben. Soc. v. Fiske, 1940, 55 Ariz. 290, 101 P.2d 205, to which Judge Bone refers, the court held that it need not appear affirmatively that the application would have been rejected if it had known the falsity of the representation, saying:

" * * * The purpose of asking the question is so that the company to which an application for insurance is made may examine the applicant and his record with knowledge of all the facts before it. It may or may not, after such examination and with full knowledge of previous rejections, determine to accept the applicant, and it would be placing an unfair and, indeed, impossible burden upon an insurer to make its right to declare the policy voidable for failure to disclose previous rejections for insurance dependent upon the opinion of a jury as to whether with such knowledge it would or would not have accepted the current application. We hold, therefore, that when an insurance company has

asked of an applicant whether he has previously been rejected for insurance, *a false answer is sufficient to authorize the company to declare the policy void without the necessity of proving whether it would have rejected the application if it had knowledge of that fact.*" 101 P.2d at page 207. (Emphasis added.) This principle has been applied consistently in Arizona, both in cases decided before the case just cited and cases decided since. See, Greber v. Equitable Life Assur. Soc. of United States, 1934, 43 Ariz. 1, 28 P.2d 817; American Nat. Ins. Co. v. Caldwell, 1950, 70 Ariz. 78, 216 P.2d 413; Modern Woodmen of America v. Stevens, 1950, 70 Ariz. 232, 219 P.2d 322.

▮ In American Nat. Ins. Co. v. Caldwell, supra, the court sums up the law of Arizona in this manner:

"The law is well settled in this state that failure to disclose material facts *with no intent to deceive,* in an application for a life insurance policy where the insured knew of those facts at the time of his application, *constitutes legal fraud and voids the policy.*" 216 P.2d at page 414.

That the facts in the case established the falsity of Morairty's representations in the three particular matters referred to cannot be disputed. The argument is advanced that the Company knew of certain facts, which, if they had pursued, would have led to the discovery of these falsities.

## II

### The Duty to Inquire

▮▮ Before we discuss the matter, we advert to the fact that Arizona in the cases just cited, Greber v. Equitable Life Assur. Soc. of United States, supra, American Nat. Ins. Co. v. Caldwell, supra, and Modern Woodmen of America v. Stevens, supra, has held that the insurance company has a *right to rely* upon representations and that *there is no duty on their part to question the veracity of*

*the applicant and no duty to pursue.* This accords generally with the modern attitude towards fraud. In the olden days, under the doctrine of *caveat emptor,* courts were inclined to think that a man dealt with another at his peril and that he should be on the lookout for possible deception, failing which, he would be penalized as negligent in failing to discover the fraud that was being perpetrated on him. The modern rule is against such an attitude. A man who deals with another in a business transaction has a right to rely upon representations of facts as the truth. Restatement, Torts, § 540; Prosser on Torts, pp. 748–749; 23 Am.Jur., Fraud and Deceit, § 1446. Illinois Bankers' Life Ass'n v. Theodore, 1934, 44 Ariz. 160, 34 P.2d 423; Lahay v. City Nat. Bank, 1891, 15 Colo. 339, 25 P. 704; Seeger v. Odell, 1941, 18 Cal.2d 409, 415, 115 P.2d 977, 136 A.L.R. 1291. These authorities sustain the view that one who has intentionally deceived another shall not be heard to say that the other person should not have trusted him. As the Supreme Court of Vermont said in an old case,

"No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." Chamberlin v. Fuller, 1887, 59 Vt. 247, 256, 9 A. 832, 835, 836.

▮ This court, in the widow's case, and the Supreme Court of Arizona in the cases cited, have applied this principle and have held that the *insured and those who claim under him are* bound by his representations and that the Company had the right to rely on them and that knowledge as to the falsity of some of them does not invalidate the policy. But even if we apply to this contract the ordinary rule which imposes the duty to investigate, we are confronted with the proposition that the duty arises only if facts came to the knowledge of a person which, if pursued, would lead to the verity of the specific representation. See, Hobart v. Hobart Estate Co., 1945, 26 Cal.2d 412, 438–439, 159 P.2d 958. In brief, it is Byrnes' contention that the record presents evidence from which the

falsity of Morairty's representations in 1947 could have been ascertained. It appears that in 1928 and 1929, the Company issued policies upon the life of Morairty. In 1936, the insurance company was advised that the insured had become disabled. In 1940, in the processing of an application of the insured, appellee was advised, due to a mix-up of names, that the insured in 1937, had diverticuli and that Dr. Bank had made a gastrointestinal study. This Court, in the widow's case, conceded the disclosure as to the diverticuli and dismissed it as unimportant to the determination of the case. It is inconceivable that matters that came to the knowledge of the insurer, nineteen, eighteen, eleven and seven years before should be carried over to the date of the new policies so as to excuse the false statements made by the insured in the application,—statements which related to conditions which *were not* and *could not* have been disclosed by any of the facts which the company had in prior years. There is nothing in the affidavits on file which indicates that medically the three concealments stated by Judge Bone in the widow's case, the hemorrhage, non-disclosure of hospitalization in 1944, and the statement by Morairty that he had been free from gastro-intestinal symptoms for six years prior to 1947, were of a character that could have been deducted from the facts in the record or from the examination of the Medical Information Bureau's files. The language of the Supreme Court of Arizona in First Nat. Ben. Soc. v. Fiske, supra, is very apposite here:

"We think the principle to be followed is well stated in Franklin Life Ins. Co. v. Dossett, Tex.Civ.App., 265 S.W. 259, 262, in the following language: 'In order to estop the insurance company from avoiding the policies by reason of its knowledge of the falsity and misrepresentation of the statements made by the applicant, it is not sufficient that it had knowledge of the falsity of some of said facts. Where a party makes a statement that apparently embraces all of the facts and thereby prevents a further investigation, he cannot claim that the company is estopped to plead the incompleteness of his answers.' See also Missouri State Life Ins. Co. v. Dossett, Tex.Civ. App., 265 S.W. 254." 101 P.2d at page 207.

In sum, in the light of the decision of this court in the widow's case, no conclusion can be reached other than that if the appellant in this case were to take its case to a jury, the court would have to direct a verdict in favor of the Company or failing, in case of a verdict for him, would have to order judgment notwithstanding the verdict, as was done in the widow's case.

It is to be borne in mind that the policies were issued at the same time upon the same application, that in each of them a beneficiary is named, in one the widow, in the other Byrnes. The conditions of the policy were the same. So are the persons named, insurer *(the Company)* and insured *(Morairty)*. The representations were contained in the same document and applied equally to both policies. The medical testimony which established falsity in the widow's case is the same medical testimony which establishes without contradiction the falsity in the case before us. And above all, assuming that there was information which showed Morairty to be a "poor risk", Byrnes is nevertheless bound by the deliberately false statements made by Morairty just as the widow was held to be. As said by the Supreme Court of Wisconsin in Bradach v. New York Life Ins. Co., 1952, 260 Wis. 451, 51 N. W.2d 13, 17:

"* * * Each life insurance company undoubtedly has well-defined rules as to the health requirements of persons it is willing to insure at its standard rates. If it is by false statements in the medical portion of a policy application induced to insure some one whom it would be barred from insuring under its rules, and such false statements have increased the risk, there

would seem to be no logical reason why it should not be permitted to raise such facts as a defense regardless of whether the insured who made the false statements is *the purchaser or owner of the policy, or whether such owner is his wife, partner, corporate employer, or other third person."* (Emphasis added.)

### III

### Byrnes' Position

■ Which brings us to the contention that Byrnes was the "purchaser" of the policy and therefore had greater rights than ordinarily attached to a beneficiary. The entire argument is based upon the fact that it may be inferred from the record that the premium on the policy before us was paid by the partner, —a fact which the agent of the Company probably knew. But we fail to see that this fact created a new relationship. If the fact that money belonging to the beneficiary is used to pay the premium, then the widow is in the same position because, under the law of Arizona, the earnings of Morairty were community property and the premium,—in half of which the wife had a vested interest from the time of its acquisition, see, Pendleton v. Brown, 1923, 25 Ariz. 604, 221 P. 213, 215; Rothman v. Rumbeck, 1939, 54 Ariz. 443, 96 P.2d 755, having been paid with community funds, the widow could argue just as effectively as Byrnes does that she should not have been bound by the representations of her husband, for she, too, was a *contracting party.* Yet this court did not hesitate to hold her fully responsible for the deception of her husband.

It is to be noted that the policy of insurance which appears in the record designates Byrnes as the beneficiary. The insurance company had no dealings with Byrnes except to ascertain through their agent the fact that and the reason why it was sought to make the partner a beneficiary. The policy which is attached to the Complaint designates him as such. The Complaint also asserts that the policy was executed and delivered to Morairty insuring his life and that he performed during his life-time "all the conditions of the policy on his part". The application for the policy contained similar references to the appellant and the original letter of transmittal from the Phoenix agent stated that "two policies are to be issued on the application, one to be paid to the insured's wife and the other to the insured's business partner", the appellant. The application contained a provision to this effect:

> "This application is made at the request of the undersigned, who intends to pay all premiums and who ratifies the statements and answers contained in such application.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> (Signature in full of person who will pay premium [if other than insured])"

Morairty retained the right to change his beneficiary, the right to assign the policy and other rights which are absolutely inconsistent with a relationship between Byrnes and the Company other than as beneficiary. Indeed, the policy would have to be re-written entirely in order to spell out for Byrnes rights other than those of a beneficiary. In his original complaint in this case he designates himself as a beneficiary and states that the policy had been issued to Morairty and that Morairty performed all the conditions of the policy and that upon his death, he, as beneficiary, made proof of death and demanded the payment of the $50,000.00, which is refused.[2]

The unsigned ratification clause does not help Byrnes. For, granting that if he had attached his signature, we would have a direct waiver, Baker v. Mutual Life Ins. Co., 1949, 32 Wash.2d 340, 201

---

2. It is true that after the motion for summary judgment was made, an attempt was made to amend the complaint by pleading a different relationship. But the complaint stands as an admission of the true relationship contrary to the afterthought after this court decided against the widow.

P.2d 893, the absence of a direct waiver *does not* stand in the way of holding him liable for the fraud of the deceased both under general insurance law and the law of Arizona. See cases heretofore cited and discussed. And see, Edwin W. Patterson, Essentials of Insurance Law, 1935, 370, 371.

We cannot see how the payment of the premium on a life insurance policy by a person who is beneficiary can, in the absence of a specific contract, different from the policy entered into by the insured, give rise to any right superior to those of the insured who applies for the policy. We cannot see how the beneficiary who chooses to pay the premiums and does not enter into a special contract has greater rights than the wife, who in addition to her community property rights, has a greater interest in the life of the husband than a business partner.

The analogy from fire insurance policies in which the courts may recognize the independent interest of mortgage holders, Germania Fire Ins. Co. of New York v. Bally, 1918, 19 Ariz. 580, 173 P. 1052, 1 A.L.R. 488, does not help. Interest in property is divisible and insurance companies may issue policies to lending agencies as "their interest may appear." For a lending agency may have a different stake in the property from that of the owner. For instance, a lending agency may have a loan upon a building, the destruction of which nullifies their investment, although it might not affect at all the owner of the fee who still retains the land. See, Fidelity-Phenix Fire Ins. Co. v. Garrison, 1931, 39 Ariz. 277, 6 P.2d 47. But we cannot partition the life of an individual into insurable segments. Human life is whole and indivisible and to hold that a third person, by merely paying the premium acquires a right to have the insurance company deal with him on a separate, independent basis under penalty of not being bound by the misrepresentations of the insured is to introduce an uncertain and speculative element into the field of life insurance, which would be dangerous indeed. For the insured, by connivance with the person who pays his premium, could secure unbreakable policies in the face of the most palpable fraud. We do not think that the law of Arizona would sanction a plan fraught with such danger.[3]

## IV

### Reliance

■ There is no substance to the argument that the insurance company did not, *in reality*, rely on the representations. The uncontradicted affidavit of Leigh Cruess states that he, as Vice President of the Company in charge of the Medical Department, processed the two policies of insurance in which Ruth Morairty and Ronald Byrnes were the beneficiaries, that he did not know and did not have any report in the possession of his Company that Morairty had been hospitalized in 1936 and in 1944, that, if the facts stated in the opinion of the widow's case had been known, Morairty *"would not have been deemed a standard risk and that said policy, Exhibit A to Plaintiff's Complaint, would not have issued."* Although under Arizona law such proof is not necessary, First National Ben. Soc. v. Fiske, 1940, 55 Ariz. 290, 101 P.2d 205; Modern Woodmen of America v. Stevens, 1950, 70 Ariz. 232, 219 P.2d 322; American Nat. Ins. Co. v. Caldwell, 1950, 70 Ariz. 78, 216 P.2d

---

3. It may be conceded that it would be possible to draw a contract of insurance in which the beneficiary would become the contracting party. See, Cyrenius v. Mutual Life Ins. Co., 1895, 145 N.Y. 576, 40 N.E. 225. It is also conceivable that in such a policy the "contracting party" might be given the right to change beneficiary, assign the policy and other rights usually belonging to the insured.

Williamson v. Williamson Paint Mfg. Co., 1933, 113 W.Va. 744, 169 S.E. 408. But the contract before us was not such a contract. On the contrary, it reserved to the deceased all the ordinary rights of the assured. And Byrnes did not by any modifying contract binding on the company reserve the rights he would now claim.

413, the position of the company is strengthened by the presence of this uncontradicted testimony that Morairty's representations were material and that had their falsity been known, the policies would not have been issued. Nor can we imply non-reliance from the fact that the risk was reinsured. Reinsurance is a well-known policy in the field of insurance. The insured has nothing to do with it. As said by the Supreme Court of Mississippi in Lincoln Nat. Life Ins. Co. v. State Tax Commissioner, 1944, 196 Miss. 82, 16 So.2d 369:

> "There is no privity of contract between the reinsurer and the individual whose life is insured."

Certainly the reinsurance cannot revivify a contract of insurance vitiated by the fraud of the insured.

In the light of what has just been said, it is quite evident that there was no issuable material fact as to which a trial should have been had.

To summarize: The insurance contract was vitiated by the fraud of the deceased which is binding upon Byrnes as the beneficiary of the policy,—despite the fact that he as a partner may have paid the premium on the policy,—as it was binding on the widow as the beneficiary of the other policy,—despite the fact that the insurance was purchased with funds in which she had a community interest. The Company had the right to rely upon Morairty's representations. They did, in fact, rely on them. The matters to which they related were considered important enough by this court to warrant denial of recovery to the widow even after a jury's verdict in her favor. The Company was not guilty of any negligent act which can be considered a waiver of the falsity of Morairty's representations. There was nothing in their files of a character which would have led to the discovery of their falsity, even if we assume that they did not rely on Morairty's statements, as they, in reality, did. So the case was a proper one to dispose of by summary judgment.

The judgment is affirmed.